Mr. Chief Justice, and may it please the Court, when States infringe the exclusive Federal rights that Congress is charged with securing, Congress can make States pay for doing so. That's our respectful submission today, one that follows from the Constitution's text and affords ample basis for this Court to uphold the work Congress did in enacting the CRCA. Article I, Section 1, of the Constitution Act, Section 8, Clause 8, what we're calling the Intellectual Property Clause, is unique within Article I in laying down an express constitutional mandate for Congress to protect specified private property rights against any and all intrusion. Consider just how pointed and clear the constitutional text is. Congress is not only to be granting copyrights, but securing them. And the resulting rights, by definition, are meant to be exclusive rights, exclusive against whom, Your Honors? Exclusive against all comers, exclusive against the world, including the government and including States. And this exercise of congressional power serves the express constitutional purpose to promote progress. How? By affording monetary recompense to copyright holders. The framers thus made very clear that all those wanting to use an author's copyright would not be able to do so. This clause's text signals a plan of the convention waiver like no other in Article I. For States to retain immunity to avoid paying for infringing the very same exclusive rights that Congress is meant to secure would be incompatible with the text as fixed and understood by the framers. And this Court has already so recognized in substance, going back to 1888 in United States v. Palmer, the Court said in holding the Federal government monetarily liable for infringing patents that Congress's power, the same power we were just talking about, could not be affected if the government had a reserve right to infringe. Same reasoning holds for States, Your Honors. And in Goldstein v. California in 1973, the Court said, and again here discussing copyrights, when Congress grants an exclusive right or monopoly, its effects are pervasive. No citizen or State may escape its reach. Ginsburg. All that would be highly persuasive if we didn't have the patent decision, the Florida prepaid decision. It is the very same clause. It's the very same secure. It's the very same exclusivity. Correct, Justice Ginsburg. But the Court was not examining the text. The Court was not examining the clause. In fact, it didn't even grant review on the basis. That wasn't before the Court. It wasn't even raised before the Court. And so all the Court did, Justice Ginsburg, was refer back to Seminole Tribe, the sweeping assumption of Seminole Tribe that no Article I clause could ever supply basis for abrogation. That's the same assumption that the Court in Katz more recently called dicta and held to be erroneous dicta, an erroneous assumption, which is the only way that the Court was able to analyze the specifics of the bankruptcy clause and find that it did reflect a plan of the convention waiver and a basis for abrogation. And in Katz, the Court concentrated on the bankruptcy authority as a unique authority. We have Seminole, which is across the board. And then we have the exception for the bankruptcy clause. Now, are you asking us to go through all of the Article III authority and take them one by one? Isn't Katz more properly read as a bankruptcy exception to the Seminole Tribe rule? Your Honor, we rely upon the methodology of Katz. And we rely upon the up-front holding of Katz. We take it to be a holding that, in fact, what Seminole Tribe had said about no Article I power supplying a basis for abrogation, that that was dicta and that was an erroneous assumption. In fact, the relevant portion of Seminole Tribe, as both the majority and the dissent in that case recognized, it dealt with the copyright clause and the bankruptcy clause and the commerce power all in the same breath. It was the same — And do you — because I read the erroneous dicta language, maybe I'm misreading it so you can tell me how, as just a reference to the statements in Seminole Tribe about the bankruptcy clause. It's the same sentence as Justice Kagan. It's the same exact portion of Seminole Tribe that dealt with all Article I clauses in the same breath. And, in fact, in Justice Stevens' dissent, and I think it was the first footnote of it, he noted that the Seminole Tribe decision by its terms would apply to the commerce — would apply to the copyright clause and to the bankruptcy clause. And Justice Rehnquist, I think, and Chief Justice Rehnquist in footnote 16, I think, engaged that assumption and said, yes, essentially, no big deal, but that is the necessary upshot of the Seminole Tribe holding as it was articulated by the Court. And that's why, I think, in Katz, this Court had to deal right up front with whether that assumption held or not, and it rejected it as erroneous. But, Justice Ginsburg, Justice Kagan, let me assure the Court, there is no other clause in Article I like this one. There is no other clause that is as pointed. There is no other clause that contemplates that there will be private property rights. But if you're right, we would then have to go back to Florida prepaid, right, and topple that rule. It would be certainly open to folks in patent cases to make that argument, Justice Kagan. I think — How could we have the two rules going simultaneously? That would be my prediction. My prediction is that ultimately the Patent Remedy Act would be revisited and properly upheld as a valid exercise of Congress's Article I powers. So basically, you're asking us to overrule Florida prepaid. I'm asking this Court to follow Katz, Justice Alito, where I think Florida prepaid was overruled in relevant part. And certainly — You think Katz overruled Florida prepaid? I think it overruled the basis for Florida prepaid. The precedential foundation for Florida prepaid was solely the relevant portion of Seminole Tribe. That's exactly what the Court was, I think, calling erroneous dicta and rejected. So I take the holding of Katz to have totally undermined the foundation of Florida prepaid. So you think the state of the law is that every Article I, Section 8 power would have to be considered independently, and Florida prepaid may hold on for a while as a poorly reasoned exception to that rule, but ultimately would have to be overruled to bring it in line with the position you're asking us to adopt today? I have only one friendly amendment to Your Honor's assumption, which is I don't think that there is any other Article I clause that reflects a plan of the convention waiver in the sense that we're discussing. In terms of the constitutional in text and the necessary implications of it. Because for the reasons that this Court has already recognized, we think it is totally incompatible with the Framers text and the Framers contemplation to say that there's any such thing as an exclusive private property right secured by the United States Congress that states are free to infringe without paying. I think that would have been antithetical to the Framers' conception. That's our respectful submission on Article I. And if the Court doesn't have other questions about that, I'll move on to section 8. The question is whether Florida prepaid is subject to our usual stare decisis rules or not. Well, Justice Kavanaugh, obviously the Court will decide what is its precedent. We read Florida prepaid as not having really clearly addressed this question. I don't think Florida prepaid reached a holding on the Article I point because the question was not before the Court there. Well, the Court said the Patent Remedy Act cannot be sustained under either the Commerce Clause or the Patent Clause. Before that, it said Seminole Tribe makes clear that Congress may not abrogate State sovereign immunity pursuant to its Article I powers. It said that without the question having been presented and without any party arguing the question, which is why I would respectfully question whether it's truly a holding, Justice Kavanaugh. But if it was a holding, it was, just as Your Honor articulated it, based solely on Seminole Tribe, the very same aspect of Seminole Tribe that we read the Court as revisiting and overruling in caps. But the Court will decide the status of its precedent if it has any qualms about the Article I basis for the CRCA. I would ask the Court to sustain the CRCA on the strength of the Section 5 of the Fourteenth Amendment basis. Sotomayor, can you articulate what plan of the convention means to you? Know what it means in cats. And they look to a textual foothold, the ability of habeas courts to grant relief to State prisoners. So that's a clear intrusion on States. I don't see the same thing in the intellectual property provision. In fact, for 200 years, there was concurrent State and Federal jurisdiction. That seems to cut against your argument that somehow the Founders thought that this was an exclusive Federal right. Take those in turn, Justice Sotomayor. Or exclusively, an exclusive right to the Federal government. A plan of the convention waiver refers to some reflection that States were surrendering their backdrop default sovereign immunity in a discreet respect as part of the constitutional convention that came out of it. You don't think that exclusive jurisdiction would have signaled that more clearly than concurrent jurisdiction for over 200 years? I think that our textual basis for the abrogation is stronger than it was in cats. In cats, as you say, Your Honor, I don't think it was in the bankruptcy clause, the plan of the convention waiver. And as to habeas jurisdiction, that was not about monetary relief against States. That was not about hauling States into Federal court. It was just about granting relief, habeas relief, to get prisoners out of State prison. I don't think that that's anywhere near as on point as what you have with the intellectual property clause, where clearly the framers' contemplation is these are exclusive rights that anyone who may infringe has to pay for. Congress's job is to secure those rights. It cannot do that without abrogating State sovereign immunity within this discreet realm. Sotomayor, the latter part you're assuming. Nothing about it. It says securing the copyright, but it doesn't say making sure that the copyright owners are paid. To promote progress. To promote progress, Justice Sotomayor. It is a preamble that is not echoed anywhere else in Article I. Some would say that injunctive relief promotes progress. Well, James Madison's. That's a damages question. That's not an issue of what promotes the arts. James Madison's conception reflected in the text of what the monopoly would achieve is that the authors and inventors would get paid for their inventions. They would get paid for their creations. And as the Court, as I indicated, back in 1888 recognized, it is antithetical to that to say that government of any kind, certainly the Federal government, can infringe those exclusive rights that Congress is to be securing. But as to section 5 of the Fourteenth Amendment, Your Honor, this is a case and a legislative record different from what the Court had before it in Florida prepaid. It is much stronger in relevant part. In part, that's because of the fundamental difference between copyright law at issue in this case and patent law that the Court was looking at in Florida prepaid. In part, it's also because you have a legislative record that is so much stronger, Your Honors. You had the Register of Copyrights, Ralph Oman, testifying to Congress, preparing a report based on a 50-state survey and a very conscientious compilation of comments and studies about what was happening to Federal copyrights and why this legislation was necessary to protect them. Alito, I think, first of all, as to the serious constitutional problem, you have Federal property rights that are been granted and that are private property rights and States are infringing without paying for them. That's a serious constitutional problem. That is a fundamental intrusion. That is a fundamental constitutional problem. And I think Congress, if it has a remedy that is conscientiously tailored around that, should have, as the Court put it in City of Vernon. Alito, 16 examples is not enough. And the mere fact that there were State infringements doesn't necessarily mean that there were State violations of the constitutional right, does it? We think it follows in the copyright context, Justice Alito. Every infringement is a violation by a State or by the Federal government is a constitutional violation. The nature of the exclusive intellectual property right is that one will have the right respected or else be compensated for an intrusion. That is the nature of intellectual property. And for copyright in particular, Justice Alito, infringement by definition means someone has copied the protected original expression of the copyright holder. And, yes, we think that that is a constitutional violation pretty much every time. But what if it's negligent? I don't think it – Justice Alito, I don't think it can be negligent in the relevant sense. The government may permit procedural due process violations by doing all sorts of things negligently, denying notice, denying opportunity to be heard, spurious welfare cancellation. Those things offend procedural due process. But there is also a takings basis for this legislation. And the Court has been very clear that a taking can occur even through a regulatory taking, as in Penn Central. And so if there is a predictable result of a government action that denies someone their protected property rights and does that without compensation, that is a Fourteenth Amendment problem. I submit that that's true in every case, but it's certainly true in most cases. And the Court's been very clear that Congress has prophylactic and deterrent rights under its Section 5 power. And I would also note as to the 16 examples that we're talking about, those examples are really in the nature of reports, Justice Alito. So one of those reports was from the Motion Picture Association of America, which said that films are being shown by State prison authorities widely. And when that was pointed out to multiple States, two of those States came back and said, we're going to stand on our Eleventh Amendment sovereign immunity. One of those is North Carolina. One of those States. That's one of the episodes that was reported. And just two other points about this. The report from Ralph Oman came in 1988. That was three years after the Court's decision in Entascadero. So the register was clear, the former register was clear, and the Congress was clear that this was an emerging problem. And what they had in the way of examples was within a three-year band of time. But do you think that record is stronger than the record in City of Birney? Your Honor, I think the intrusion here is much lighter than City of Birney. Here, all that States are being held to substantively is the same rule they've been under since the founding. Don't infringe copyrights. Everyone agrees that that is an obligation of the States. Well, that may be true, but the question is, is there greater congruence and proportionality here than there was in City of Birney? Or maybe that we should reexamine City of Birney, too. I'm not urging that. I'm not urging that, and I don't think the Court needs to reexamine that, because there isn't the same sort of congruence and proportionality problem. Part of what was at issue, I think, in City of Birney, and rightfully concern the Court, is Congress was redefining the substantive law. It was intruding upon the substantive conduct of States and basically changing the substantive rules of what would constitute a constitutional violation. That's not what you have here, respectfully, Justice Alito. This is Congress looking at something that is a cardinal sin. It is States infringing Federal copyrights, protected Federal property. And it's enacting a remedy that is precisely tailored to that. States have to pay what any private infringer would pay. States have to pay what they would insist an infringer of their protected copyrights pay. That's all Congress was doing in the CRCA, and I don't think that there should be the same sort of empirical skepticism on the Court's part, especially given the fact that Congress was so clear about why the problem was newly emerging and why, to use the words that are found in the legislative record, this was just the tip of the iceberg, because copyright holders, small businesses, individual authors, did not have the means, did not have the incentives to be going to court and reporting instances of deprivation. Ginsburg. You said it was inevitably intentional, copying. But North Carolina says that it used the copyrighted works only for educational purposes, and it got that right from the settlement that the parties reached. So that sounds like North Carolina saying we were far from intentionally copying. We thought we were just carrying out the rights we had under the settlement agreement. Your Honor, that's what they say. Of course, we're here on a complaint. We're here on a motion to dismiss that was granted, and we are entitled to have all inferences drawn in favor of the allegations of the complaint. And if Your Honor looks at the settlement agreement, it's very clear that it needed to be watermarks and time stamps that were on North – on any images that North Carolina might use. That was not on the images that they were using. When copyright infringement was pointed out to them and they were caught red-handed with that, they returned to infringement. The infringement kept up even after the filing of the lawsuit. That's in the complaint, too. Blackbeard's law was then passed by North Carolina to make sure that they could get out from under the settlement agreement and they could basically get off the hook for liability for their infringement. That, too, is in the complaint. That's a defense that North Carolina raised in a parallel State court suit. They pointed to Blackbeard's law to basically evade any liability for their copyright infringement. And so if you look at the complaint, I'd point the Court to paragraph 73 through 75 and to paragraph 80. It is explicit that these were intentional, uncompensated infringements by the State and that they were unconstitutional in violating both the fourteenth amendment and the Takings Clause. I mean, that's the case. Kagan, I'm sorry, Justice Kagan. I was just going to say under the rationale that the Court articulated in U.S. v. Georgia, Tennessee v. Lane, at the very least it should be open to my clients to be able to proceed on this complaint and show that there was something unconstitutional here, Justice Alito, and the CRCA is valid as to that. Kagan.          Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Now, what's the difference between the two, other than eight, you know? Part of it is the fundamental difference between patents and copyrights. In Florida prepaid, the Court's dealing with a body of law where States can be totally innocent in their infringement. They could independently arrive at an invention. They could have no awareness that anyone else came first. You're still going to be liable for patent infringement. Copyright law, by definition, is much more circumscribed. For there to be infringement, it requires that a State have copied the original expression of someone else. Absent that, we're not talking about a copyright infringement. Kagan because you could look at 16 as a really low number. There are 50 States and if 16 of them infringed once, that gets you to 16. That wouldn't strike me as a major national problem. It was report – there were 16 reports, oftentimes of multiple instances of infringement or bad faithful conduct by States. That's encompassed within the 16 that we're referring to and as to that, there were dozens of comments that were received about is this a bigger problem, is this an increasing problem? And Congress, per the register, found that, yes, it was. And it might be different, Justice Kagan, if there were 16 examples after three decades had passed, but the reality is Congress saw the tip of the iceberg of this problem. It saw something that was growing quickly and said this is a serious problem for the Fourteenth Amendment. We're going to put remedies in place in order to stop it, in order to deter it. And you have from the amici on our side a whole chorus of industry associations, including the Chamber of Commerce, including the Copyright Alliance, the way that this iceberg has grown much, much bigger. Congress is exactly right. Kagan. How do we think about that? Because a lot of that is not in the record. Do we close our eyes to that? Do we act like a trial court with respect to those sorts of facts? What do we do? You have a clear rationale from Congress in the record, which is that there was a newly emerging problem and a tip of the iceberg, and Congress wanted to ward it off, Justice Kagan, and perhaps in a case like City of Burney, the Court might be skeptical as to whether this was a good-faith sound prediction by Congress or whether it was paranoia or whether it was pretextual. I think the Court should be heartened here, Justice Kagan, by the fact that exactly what Congress feared would come to pass has come to pass over and over and over again, and there's a one-sided chorus on this. It just confirms the reality, I think, and the soundness of Congress's prediction. Breyer. Why hasn't there, after Florida prepaid, why do you think — why has there not been — have not been many, many instances in which States decide, well, look at all this tech stuff, it's fabulous, we'll just copy all the patents? Why not? There has been a lot. I mean, there has been a lot of that, and you have that from the amici, and I think it's also influenced licensing regulations. And all over California, why doesn't California have a budget problem? We'll just take all the Silicon Valley material and we'll copy it. If you read from Dow Jones, I'd commend, Your Honor, that that's what they did tens of thousands of times over. I'm not talking about copyright. I'm talking about patents. As to patents, I don't think that States are in the patent business to the same extent, Justice Breyer. Why don't they — why don't they — here's the solution to all their budget problems. Well, maybe they're afraid that this Court might be there at the end of the day to answer unresolved questions after Florida pre-patch about — What? What question? We apparently said they could go do it. Well, we think that there's still an Article I — a question is to the Article I basis. That's what we're respectfully urging. And certainly Congress — I, of course, dissent it. I know — well, Justice Breyer. But you — what you say raises an interesting question under Section 5 of the 14th Amendment. When we have decided that the congressional record at the time of an enactment that attempts to rely on Congress's Section 5 power is insufficient, and in subsequent years, there are events that would have made the records a lot stronger, what does that do to the decision? Does that mean that it's subject to reexamination based on what has happened after that point? So why should we look at events that occurred after the enactment of this? Because you've never looked at this legislative record before. When you look at this legislative record, you find a predictive judgment by Congress that is a well-reasoned and logical and evidence-based predictive judgment, that this is a real phenomenon. It is emerging. It's being reported from multiple sources. It is quite concerning when you look at this from 14th Amendment principles, among others. And so they decided to do what they did. So that rationale is corroborated, Justice Alito. There's a reality to it, a grounding that is evident in what has happened subsequent to that. And I think if the Court were to go, from our perspective, the wrong way in this case, the problem will get that much worse, because that will be taken as a green light for States to continue with their infringement without paying for it. So can Congress say we're enacting this under Section 5 and we recognize that there's not much of a record of State violations at this point, but we predict that there is going to be a record? If the remedy is sufficiently well-tailored around the constitutional deprivation, my answer to that is yes, Justice Alito. I think we are stronger than that. But to take U.S. to take Tennessee v. Lane and U.S. v. Georgia, there the Court was looking at essentially what are the facts of specific cases or a specific set of cases, and saying from the Court's perspective, yes, this would violate the Constitution, therefore the remedy is constitutional as to that. Alito, I didn't understand you to be making an argument under U.S. v. Georgia. Am I wrong? You're making an as-applied argument to this particular case? I think it's on North Carolina to make an as-applied challenge, Justice Alito. Our respectful submission is that the CRCA is constitutional as enacted by Congress and as relied upon by us in this case. And if North Carolina wants to argue that it is an unconstitutional application as to them, it's their burden to do so. And we support the arguments of our amici that say the Court could ultimately decide this case under U.S. v. Georgia or a Tennessee v. Lane rationale. I'm urging the Court in the first instance simply to uphold the CRCA the way that Congress enacted the CRCA and envision for it to be applied. You didn't make below the any at least I didn't see an argument based on U.S. v. Georgia. We didn't, I think, cite U.S. v. Georgia. I think that is true, Justice Ginsburg. We do rely upon the arguments of our amici, and I stand by my submission to Your Honors that if anyone is trying to argue that the CRCA is unconstitutionally applied in this case, it's North Carolina, and the Court can decide, as it decides so often when it comes to facial challenges, that the CRCA is not facially unconstitutional, but it could be open to States in an appropriate case to make the as-applied challenge. Sotomayor, you've done a very nice job of showing in your papers, the Blackbeard law does trouble me deeply, but you're doing nothing with proving the proportionality to the problem, because there are States that presumably have fine remedies to handle any infringement. You've shown some failings in this State's processes, but I don't know how any of the evidence developed by Congress shows that all 50 States and territories, additionally, don't have adequate State systems to address this issue. If I may answer the question, Mr. Chief Justice. Very briefly, Justice Sotomayor, number one, in the legislative record, the House report, the committee report at 9 and 10, the House emphasized how important copyright damages are, specifically statutory damages and attorneys' fees. It's the difference between loss of the right and protection of the right. That's how important it is. And, of course, the copyright statute preempts any equivalent State laws. So there is no recourse for the copyright holder who's complaining specifically of copyright deprivation outside of the CRCA. Thank you, counsel. Mr. Park. Thank you, Mr. Chief Justice, and may it please the Court. State sovereign immunity is a fundamental feature of our Constitution's structure. As this Court has repeatedly reaffirmed, immunity from private lawsuits seeking money damages was inherent in the nature of sovereignty at the founding and remains today. And the Constitution preserves this aspect of State sovereignty unless there's evidence that the State surrendered it when they ratified a particular constitutional provision. Now, my friend has failed to identify any historical evidence that anyone at the founding remotely contemplated that the Intellectual Property Clause would allow for damages lawsuits against States. In fact, it was not until the 1970s, nearly two centuries after the first Copyright Act, that a Federal court ever awarded damages of this kind. Now, Mr. Allen seeks to portray this settled state of affairs as somehow anomalous, but nothing could be further from the case. All of Congress's general lawmaking powers are subject to limits found elsewhere in the Constitution, including limits that protect State sovereignty. And so Congress could not commandeer State legislatures and force them to pass copyright protective laws, nor could they under separation of powers principles vest judicial review of copyright claims in the Senate Judiciary Committee. Likewise, State sovereign immunity limits Congress's authority to expose State treasuries to the Copyright Act's exorbitant financial remedies. And for that reason, too, the Act cannot be justified under Section 5 of the Fourteenth Amendment. Copyright infringement rarely rises to a constitutional violation at all, let alone pose the kind of serious constitutional threat that allows for expansive remedies like abrogation. And liability under the Act is expansive. It's vastly greater than anything required by the Due Process Clause. It includes statutory damages of up to $150,000 per infringement, even if the plaintiff cannot prove she suffered any actual harm. And it creates a strict liability regime that covers negligent and even innocent infringement, even though, of course, only deliberate property deprivations can violate the Constitution. And these concerns are far from theoretical. The First Circuit has affirmed a $675,000 judgment against a college student for sharing online a few copyrighted songs, sending him into bankruptcy. And the due process concern that is ordinarily raised in a copyright damages lawsuit is whether they're constitutionally excessive. What is to prevent, if I can go to the same question, a wonderful money-raising thing, what the State decides to do with its own website, charging $5 or something, is to run Rocky, Mrs. Marvel, whatever, Spider-Man, and perhaps Groundhog Day. All right? Now, great idea. Several billion dollars flows into the Treasury. OK? Now, if you win, why won't that happen? And by the way, if you're writing to the Constitutional Convention, you're a member, OK, and you write these words, copyright is to promote this progress of science and useful arts by securing for limited times to authors, and to authors, the exclusive right to their respective writings. But of course, California decides that the person who wrote Rocky, Mrs. Marvel, et cetera, will unfortunately receive nothing, because everyone will have seen it on the State's own streaming device. What is your response to that? So there are two important separate issues at issue there, and I'll start with the text. So the exclusive right is, well, sovereign immunity does not invade the exclusive right. So I think that hypothetical misunderstands respectfully the role of sovereign immunity in our constitutional system. As this Court said in Alden, states are not relieved of their binding obligation to comply with federal law. And the ordinary remedy required under the Constitution when a sovereign violates federal rights is an injunction, and not money damages. Oh, it's, by the way, we ran it yesterday. You could have your injunction. You see my point? Yes, exactly. Well, so I agree that under sovereign immunity, as a necessary consequence, there will be hard cases where statutory violations are not remedied. But that, I think the important understanding that the founders had is that when you sue a sovereign, on the opposite side of the judgment are the people and the people's money. And so the entire point of sovereign immunity, as this Court said in Lewis just a few terms ago, is to protect state governments and allow them to make their own choices as to how to spend scarce government resources. They're not going to be hard cases. They're going to be easy cases. And it's not, and Justice Breyer's point is that it could be rampant, states ripping off copyright holders, and how is that, how can that be squared with the which presumably a ruling in your favor will do nothing but encourage them to do? So I think that's the beauty of the Copyright Remedy Act, and combined with this Court's Georgia decision. So on extreme hypotheticals, such as Justice Breyer outlined. Why is it extreme? That's right, you've said hard cases and now extreme. Why won't it just be a standard case and not so extreme? Well, so whenever a plaintiff can reasonably allege that there has been intentional copyright infringement and there are not adequate remedies, then under this Court's Georgia decision, they can bring a direct constitutional claim. We don't dispute that. And so I think to the extent that the Georgia issue is relevant here at all, it's to the fact that it relieves many of these concerns that Justice Breyer and Justice Kavanaugh have outlined. I think that, well, so if we were to discuss the Georgia issue here, I think we have been here litigating this case against Mr. Allen for four years, and the first time that he ever raised this Georgia issue as a direct constitutional challenge was in his reply brief in this Court. You won't see it in the petition. You won't see it in his briefs below or in the transcripts of the argument. And of course, for that reason, the lower courts never addressed it. They never ---- Breyer's view is that in fact, under the Fourteenth Amendment, this statute is valid insofar as my Captain Marvel example deliberately takes property from people. So is that what your point is? Yes. All right. If that's your point, then you concede their point, whether they raised it or not, somebody else would, you concede that this legislation is valid. You are just saying it only applies to instances where the State deliberately takes Captain Marvel. That would cure my problem to a considerable degree. But that is the concession on your part? I think it follows naturally from this Court's Georgia decision. But I would add one additional element, which is to complete a due process violation for a deprivation of property, two additional features are required. You need to be deliberate and there needs to be no alternative remedy. And here there are other alternative remedies that could be available. Let's take deliberate first. So it is alleged that North Carolina is infringing on copyright, copyrighted works. There is a settlement. And then North Carolina starts up doing exactly the same thing that it did before the first. That sounds pretty intentional to me. I think it would be intentional if the State had not explicitly bargained for a provision that says we can use Mr. Allen's images for noncommercial purposes. And now, I think that that highlights how this dispute is really a dispute over the scope of a contractual license that the State received. There is a pending breach of contract lawsuit in State court where the State and Mr. Allen's business partner, Interstall, are debating these exact facts, whether we have exceeded the scope of our license by, for example, not putting watermarks on the images and that sort of thing. So I think that relieves. Sotomayor, I'm sorry. Finish. Oh, well, I just was going to point out as well that I think that relieves any actual due process violation that could be here, because of course there's the alternative remedy is a breach of contract lawsuit, which we have not asserted sovereign immunity for. We've affirmatively waived our immunity in State court for breach of contract  Sotomayor, what do I do with the Blackbeard law? It is deeply troubling. It's a State saying even if I'm infringing, you can't get anything. That's basically how I read that law. What remedies do they have under Federal law for a State doing something like that? So I agree it's a strange law. I think there are two separate points I'd like to make. So first, it can't possibly have any relevance to this lawsuit, because it was passed in 2015, two years after the alleged infringements in question.  Sotomayor, well, it could to a Georgia argument, obviously. Well, so I think that exposes the second issue, which is that there are two types of claims in this complaint. There's a copyright infringement claim and related claims, and there's a declaratory judgment claim asking that that law be declared preempted. Now, Mr. Allen has not sought cert on the declaratory judgment claim, and that would be the remedy in that circumstance. But the district court – sorry, the Fourth Circuit, and this is on pages 37 to 39 of the Petition Appendix, the Fourth Circuit rejected the declaratory judgment claim because it held that the 2013 settlement agreement said that your images, Mr. Allen, are subject to the public records law, and the 2013 version of the law said that photographs that the State received in public business are public records. And so that amendment couldn't possibly have affected Mr. Allen's rights to his images. So why wasn't it a taking? Why wasn't the passage of that law a taking, when the law declares that something that is private property is now a public record? So I think it possibly could be, on different facts, if Mr. Allen hadn't already agreed in a contract that his images were public records. But I think that this would be a pretty extraordinary vehicle for this Court to decide when copyright infringement can constitute a taking. I'm not aware of any Federal court that has ever reached that question because it hasn't been litigated. He never alleged that the use of the images was a taking below, and he mentions it in his brief here, but he doesn't even describe the substantive standards that would apply under either a direct physical invasion analysis or a penitential deprivation of all economic value analysis. And so I think that the images here could not possibly be a taking, because the question here is whether our display of a handful of images and a few educational videos in a museum nonprofit newsletter constituted a complete deprivation of economic value. It surely wasn't the physical occupation of those images. And so I don't think the takings clause is relevant here.               Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. I think that it should have followed the rules laid out by this Court in city of Burney and subsequent cases. And I think that to be an all fairness to Congress, those decisions postdated the statute here. And so they weren't even trying to meet those standards. And it is an unfortunate consequence that it's not there. Kagan.   Kagan. Kagan.  Kagan.  Kagan, because it's a document that requires a trademark infringement, as would be the death of an incriminating terrorist. It's an infringement, and it would be infringement where there's no alternative remedy. Kagan. Well, can't Congress say something like, in copyright, you know, any violation requires actual copying? So we're going to assume that 80 percent of the violations in the world are intentional? So I think that that would activate the danger that this Court designed the city of Burney test to prevent, which is changing the substance of law under Section  Now, under copyright law, that willful infringement is a recognized standard. Well, because there's clearly some allowance for Congress to devise prophylactic rules. And this would seem to be a perfect example of, like, you know what, given the requirements of a copyright violation, we think the vast majority of them are going to be intentional and, therefore, are going to be constitutional violations. Are you saying Congress can't say that and just target copyright violations generally? I think that they could. I think on a different record, if they had focused on intentional infringement and said, you know, this is widespread, there are no adequate alternative remedies, this is a serious national constitutional problem, and we will enact prophylactic remedies to address this. Well, how do they show that? Well, I think at the very least, they focus on intentional infringement. I would direct the Court to Mr. Koenig. I think I just talked about that. They've decided that 80 percent of copyright violations are intentional because copyright violations always involve actual copying. It's hard to actually copy something negligently. Not impossible, but hard. So Congress has decided, you know, the vast majority of these are intentional, therefore are constitutional violations. Now what does Congress have to do? So I think there would be the additional analysis, which is the proportionality of the test, which requires that there be some tailoring of the remedies that are given by Congress to what is required by the Due Process Clause, and no one has ever claimed, I'm not aware of any copyright holder that has ever claimed that the exorbitant remedies found in the Copyright Act are required by Due Process. I mean, we're talking about $150,000 per infringement, even for an infringement where the plaintiff says, I cannot prove any actual damages, but because this infringement was so egregious on its merits, I deserve statutory damages. Breyer. Here is now I see the problem, which you've clarified very much for me. It's that the choice for us now is, say, your view would be that the States can copy without doing anything, unless that copying violates the Due Process Clause. And in that respect, you agree that the statute can be upheld. If we accept your view, we've got to decide how copyright, copying, and the Due Process Clause fit together, which, to my knowledge, this Court hasn't really gone into. And it sounds like a pretty good mirror's nest. Now, the other view would be you'd lose, which you don't want to do. But the other view would be it's likely that there are enough cases where it would violate the Due Process Clause for us to accept the statute as a whole, thereby creating, in a sense, another somewhat different exception to the statement in Florida prepaid. I'm trying to get our issue, and I'm trying to say it fairly from your point of view and from the other point of view. So let me clarify in terms of your first construct. I don't think that's actually accurate. So under copyright law, a whole range of copying doesn't violate the Copyright Act at all, when there's fair use that applies, when, as here, it's contractually authorized. And so an additional element is required for that to be considered intentional, and copyright law has a built-in set of standards here. What Nimmer says and what the Second Circuit says, what is fairly well accepted in the lower courts, is that willful infringement is when the defendant has actual knowledge that their act constitutes copyright infringement. Now, there is some dispute as to whether recklessness, as to whether it constitutes copyright infringement is enough, but I'm not aware of any court that has ever said that the intentionality requirement, as is sometimes relevant in copyright law, is ever met by mere copying. In fact, you know, 504c2 of the Copyright Act says, quote, innocent infringement is still liable. And innocent is defined as when the defendant had no reason to be aware that the infringement was. Kagan. Do you think Congress is able to make judgments about what proportion of copyright violations are indeed intentional? If Congress had said, given the requirement of actual copying, we think a vast majority of copyright infringements are intentional, would that be precluded? Would that fall within Congress's power or not? Yes. I think that Congress warrants a great deal of deference in this area. And so if they had conducted that examination and they had made that conclusion in a finding or it was clear in the legislative record that that was what Congress was focused on. So do you think that's what Congress has to do here? Congress has to say, we think most copyright violations are indeed intentional and therefore violate due process. And here, there are 30 examples. Would that be enough? I don't believe that there is a strict numerical threshold that is required to legislate under Section 5. I think that what City of Bernie says is that the remedy has to be tailored to the scope of the constitutional violation, right? So if there were 30 violations, then Congress could say, well, here is a proportional remedy to that level of unconstitutional copyright. Well, why isn't the proportional remedy the same remedy that everybody else has to pay? Because the ones Congress has decided that we think that there are loads of constitutional violations going on, why doesn't the State have to pay what every other actor would have to pay when it engages in those constitutional violations? Why isn't that almost sort of by definition proportional? That's what people pay. It would be proportional to the Copyright Act, but Section 5 has to be focused on enforcing the Due Process Clause. And the Due Process Clause only requires at most compensatory relief. And so I think that that exposes how my friend on the other side is trying to constitutionalize copyright law. What we're talking about is the Due Process Clause and what that requires, and not ordinary infringement. Breyer. But it's both you and your friend, because what you will have the courts doing is, case by case, when, say, California tries to run, they won't run Captain Marvel, maybe it's some old movie, you know, and they say it's fair use. And we can think of a million — I'm not a million, but thousands of examples. And case by case, when someone tries to stop them, the courts have to decide whether the Due Process Clause in this instance, where the University of California thought it was fair use to make 50,000 copies of Norman Mailer's book or something, you know, you say, case by case, we have to decide the constitutional question. I think that's what — where you're leaving me. And it's tough. It's tough sort of both ways. Well, I don't think that's going to be difficult for the lower courts to wade through that state of the law, because they're merely applying the ordinary rules of copyright. So willful infringement, we think, would constitute intentional infringement. And they merely assess whether alternative remedies are available. And that is something that courts are very well-equipped to do, to decide whether an alternative claim would be meritorious. Now, one other alternative remedy that no one disputes here is that they could try to sue the individual officers personally. Now, of course, we wouldn't like that at all, but I think the settled state of the law, at least in the lower courts, is that copyright infringement claims can be sued — can be brought against individual State employees. But they won't have the same deep pocket that the State has. Let me ask one aspect of this question, Mr. Park. States can hold copyrights. They can be copyright holders. And they can sue anybody in the world for infringement. Is something unseemly about a State saying, yes, we can hold copyrights, and we can hold infringers to account to us, but we can infringe to our heart's content and be immune from any compensatory damages? Could Congress say — condition the copyright privileges that States have by saying, States, we're going to allow you to copyright works, but the price is you have to be fair to the other side so that when you are infringing, you will be liable? Could — does Congress have Article I authority to do that? So I don't think that they could do that, because I think that would be an unconstitutional condition. It would be a hard case that this Court would probably decide. But what they could do to bring the parties into parity would be to say that States, you can't hold copyrights at all. States have never claimed a constitutional entitlement to be able to hold copyrights. The United States Government can't hold copyrights. What it has done as a matter of statute, and this is an interpretation of the 1909 Copyright Act, where because Congress said the United States, you can't hold copyrights, courts have said, well, that implies that States can hold copyrights. But I think that they would be within their rights to remove that right and remove that anomaly. Counsel, just to get back to your statement that all you have to do is sue the State officers, you'd certainly reimburse the officer, wouldn't you? Yes, that's correct. So is that all they have to do, just name the officer rather than the State in their infringement action? Well, I think that — so, yes, that most States would reimburse their State officers if it was within the scope of their employment, and that there would be additional hurdles in that kind of case. Qualified immunity would apply, and qualified immunity applied in this case, and that's why the claims were dismissed against the individual officers. Well, then it's not much of a — it's not much of a response to say, well, you can sue the officer. It gets thrown out right away, but you can still sue him. So that's a reason not to hold the State liable? Well, I think it is in this context, and here's why. Because intentionality under the Due Process Clause is roughly equivalent to the qualified immunity analysis. That's what this Court said in Kingsley v. Hendrickson, that its intentionality is judged by an objective standard under all the facts and circumstances available to the officer, is what they did, can that be construed as intentional. That's very similar to the qualified immunity analysis, and I think it mirrors what the Fourth Circuit did here, where it says, well, there's this contract, it's a little bit ambiguous, it's not clear whether these are noncommercial uses, but we won't say that what they did was intentional when a reasonable officer would read that contract and say, well, I think that educational videos and a museum newsletter are noncommercial uses, and so they're covered by the contract. Mr. Park, can I take you back to the interesting suggestion that perhaps Congress could have justified what it did in this Act by saying that we predict that a high percentage of copyright infringements are intentional and, therefore, violate due process. If we were to accept that, is there any reason why the same reasoning would not apply in patent litigation? No, I don't believe there is any distinction there. And I think that that highlights how — I don't think that that is actually what the lower federal courts have not said that most copyright infringement is intentional. It's the rare exception that infringement is held to be willful. And so I think that it would be based on the legislative record. You'd evaluate whether Congress had a good-faith basis for making that conclusion. I think on the current state of the law, as I understand it, they would not have that good-faith basis. So I'd like to just turn very quickly to this idea that future infringement could be enough or that these, you know, examples that have arisen after the Copyright Remedy Act could be relevant to this analysis. I think that that would be at odds with all of this Court's Section 5 cases, including the cases where this Court has upheld abrogations as valid, such as Hibbs. In all of those cases, they said Congress must identify a widespread pattern of constitutional violations, and in the legislative record before it. And I think that that goes to the heart of the City of Burney test, which is evaluating Congress's work and making sure they're not trying to change constitutional law through Section 5. They have to be enforcing the law as interpreted by this Court. I think if I could make just a few words on stare decisis, because I think that's incredibly important in this case. I think that my friend acknowledged that a ruling in his favor, at least on Article 1, would effectively overrule Florida prepaid, that there would be some interesting law review articles written about whether it did so on its own merits or whether there has to be subsequent litigation, whether it automatically revived the Act, but no one that has ever evaluated the Intellectual Property Clause has ever been able to identify any distinction between copyrights and patents that could be relevant to this analysis. And so, yes, if this Court rules on the basis of Article 1, we think that Florida prepaid would be overruled. And I don't think that Katz can bear the weight that Mr. Schaeffer tries to place on it. So Katz, and this is at page 363 of Katz, it says, Our assumptions about the bankruptcy clause were erroneous. And I think that that was a reasonable thing for Congress, for this Court to say, given that there had been nearly a century of precedent going all the way back to 1933 in New York v. Irving Trust, saying that bankruptcy discharge proceedings -- Well, it said the blanket statement in Seminole Tribe was incorrect, and Florida prepaid relied on that same blanket statement in Seminole Tribe. It seems to be a problem for that blanket statement in Florida prepaid. Yes. I completely agree. I think that the reasoning of Florida prepaid's Article 1 holding has been undercut, and that would be a reason to revisit. It's two sentences. That's correct, Your Honor. It's very limited. And it's based on a principle that has been undermined by Katz, I think. So you would apply the ordinary rules of stare decisis. That's the only point here. Not that it has not been undermined in any respect. And I think if you view this question in terms of the principles that stare decisis is supposed to uphold, you know, legal stability, reliance on this Court's decisions, that that would really bring this issue into focus, because everyone who has evaluated Florida prepaid and whose job it is to evaluate this Court's rulings and say, what are my legal rights and obligations, has said that it covers both the Copyright Remedy Act and the Patent Remedy Act, including the United States government, which has — I really don't follow your reliance argument. Yes, the State may be relying, but who other than the State relies on the State's right to infringe without damage liability? Who other than the State? I think that I'm speaking about the State's reliance interests or the State's generally. And I think here's why that matters, and I would bring it back to this case. So our Cultural Resources Department is operating on a shoestring budget, trying to recover and excavate and preserve the remaining aspects of the Queens and Revenge, around 40 percent of which, under their estimates, is still on the bottom of the ocean. And they are doing that work. And it's — when there are competing legislative priorities, such as school funding and disaster relief and all sorts of other more important priorities, it's hard to get money to fund important work like this for the State's history. Though, Mr. Park, what Justice Ginsburg was suggesting, that it's not the strongest reliance argument to say we relied on this Court's holding to infringe other people's rights. Not to infringe on other people's rights. I think that what they did here is that they posted online on good faith — faith reliance on a contract. It could have also been unfair — on good faith reliance on perhaps an aggressive reading of fair use in other situations. But they did that because they thought that they wouldn't have infringement liability of up to $150,000 per work. And there are — you know, I can give legions of examples where juries have awarded astronomical copyright damages. There's a jury in Minnesota that awarded $1.9 million against a single mother of four for downloading and sharing a few copyrighted images online. And the Eighth Circuit reduced that judgment to $220,000. She still went bankrupt. But because these issues are ordinarily thought to be a due process problem on the other side. And so I think that you would see states retract from their uses of copyrighted works in a way that benefit the public. There's an amicus brief from the Library Association saying that this would imperil — copyright infringement liability, monetary liability would imperil digitization projects and other works of archives. And I think states are simply different. I don't think it's respectful to the interests of State government to say that they will infringe at will if damages liability is taken off the table. Thank you. Roberts. Thank you, Mr. Park. Four minutes, Mr. Schaffer. Mr. Chief Justice, may it please the Court, starting with Blackbeard's law, Justice Sotomayor, I want to be clear, Blackbeard's law was passed after the allegations of infringement in this case, after North Carolina had been caught infringing. It was then used as alleged in the complaint by North Carolina to defend against the State court suit by Intercel because they said Blackbeard's law had voided the settlement agreement. It was now contrary to North Carolina's public policy, and they couldn't be held to the settlement agreement, nor could they be held liable. That's in the complaint. That is as alleged, and I don't think there's any ability by the State in this posture to contradict those allegations. As to the Intercel dispute that Mr. Park talks about, North Carolina State court, Intercel does not hold the copyright. So their suit by definition, it's not trying to vindicate the copyrights. That suit was just decided by the North Carolina Supreme Court after North Carolina for years interposed sovereign immunity defenses, saying that the breach of contract action had not been properly filed administratively, there needed to be administrative exhaustion. So that suit is continuing on. It's not as though sovereign immunity was no impediment, and it's certainly not out to vindicate copyrights. As to the images in question, I just have to emphasize, Your Honor, my clients have put in two decades of work, essentially, trying to be there when these images are excavated underwater, at great expense, at great risk, and this is all, essentially, my clients get out of it, the copyrighted images. And the allegations of the complaint are that North Carolina not once or twice, but repeatedly and systematically was infringing those copyrights, was caught doing it, paid $15,000 under the terms of the settlement agreement, went back to doing it, even after this complaint was filed, they continued to infringe the copyrights. And the resolution by the Fourth Circuit is everything is dismissed. And as to injunctive relief, Justice Breyer, Congress found it provides no meaningful remedy in this context, different from the patent context, but it's all about getting paid for past damages in order for this to be a meaningful remedy. And in this case, the request for injunctive relief was thrown out. Why? Because North Carolina did exactly what you articulated, Justice Breyer. They said, well, we've stopped infringing those images. Now that you've pointed it out in court, we've taken those down. What else have you got? And without benefit of discovery, the Fourth Circuit viewed that as the end of the request for injunctive relief, and that's how it goes in copyright cases. Now, as to the notion that there could be individual suits against individual officers under 1983, you're exactly right, Chief Justice. Qualified immunity is a defense in this context. I'd commend to the Court the Fourth Circuit's decision on this point. It's at 37A, 39A. They basically said, because there's some defense that's available to these officials, they say they read the settlement agreement differently. Maybe they didn't know it was copyright infringement. Maybe they weren't looking for the watermarks or the timestamps. That is a good enough defense. Qualified immunity gets them out of the case, and those claims, too, are dismissed. That's why it's so important, part of why it's so important in copyright cases, that there be secure remedies for copyright holders. That's true against States, and it's true against anyone. Most copyright holders, unlike patent holders, Justice Alito, these are small fish. They have not sunk costs into this sort of a registration. And they need to have secure statutory damages and attorneys' fees in order to come to court at all, because in copyright cases, as Congress found from the testimony before it and the submissions of the register, you need to have statutory damages. Otherwise, how can you quantify what the harm was, and especially given how small the stakes are in copyright cases and how under-heeled most copyright plaintiffs are, if you don't have those statutory damages, you don't have a right. And that is specifically found by Congress in the House Report at pages 9 and 10. So, Justice Kavanaugh, you ask about what happens in ordinary cases. This is exactly what Congress looked at. They said the rule in copyright cases, absent the CRCA, is that copyright infringement pays for States. They will get away with it every time. You will not have copyright holders who have incentives and means and attorneys to bring suit. That should not be the outcome in this case. And to say respectfully that it's incumbent upon every copyright plaintiff who sues a State to prove a constitutional violation and willfulness in the way that Mr. Park articulates is to render the right nuggatory, and the CRCA as well. Thank you, Mr. Roberts. Roberts. The case is submitted.